UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

STEVEN D. HARRISON,                                                        Case No. 22-10933-t13

      Debtor.

# OPINION

Before the Court is Racquel Harrison's Amended Motion to Determine that Stay Does Not Apply to Division of Retirement Account or, Alternatively, for Relief From Stay. To rule on the motion, the Court must construe a final divorce decree entered almost two years prepetition and determine its effect on Debtor's retirement account. The Court finds and concludes that the final decree divided all community property into the separate property of the divorcing parties, including the retirement account. The motion therefore will be granted so Racquel can complete the property division ordered by the state court. However, for the reasons explained below, the order will not take effect for 30 days after entry, to give the parties time to negotiate a possible settlement.

A.     Facts.[1]

For the limited purpose of ruling on the motion, the Court finds:[2]

---

[1] The Court took judicial notice of the docket in this case and the docket of the pending state court divorce proceeding, *Harrison v. Harrison,* Case No. D-202-DM-2019-01754. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

[2] Some of the Court's findings are in the discussion section of the opinion. They are incorporated by this reference.

Debtor Steven Harrison and movant Racquel Harrison were married for about 21 years. Debtor is an air traffic controller and has been a federal employee for at least 20 years. The Court has no information about Racquel's work history or current occupation.

On June 7, 2019, Racquel filed for divorce in New Mexico state court, commencing Case No. D-202-DM-2019-01754. On January 15, 2021, the state court entered a Final Decree of Dissolution of Marriage (the "Final Decree"). The economic terms of the Final Decree can be summarized as follows:

> Spousal Support. Debtor must make monthly support payments of $2,000 to Racquel. The spousal support payment obligation is "indefinite and modifiable." The state court retained jurisdiction over the issue of spousal support.
> Thrift Savings Plan Account. The state court ordered: "The community credit card debt set forth below shall be paid by a withdrawal from the Thrift Savings Plan ("TSP") account in Husband's name. The balance of the TSP, if any remains after payment of the debt and subject to the loan thereon, shall be divided equally between the parties. . ."[3]
> House in Paola, Kansas. Racquel receives the net proceeds from the sale of a house in Paola, Kansas ($8,011).
> Albuquerque House. Debtor must pay $11,290 to the mortgage company for the shortfall in selling the former marital residence in Albuquerque, New Mexico.
> Other Assets Apportioned to Racquel. The Final Decree also apportioned to Racquel:
> - BBVA checking and savings account in her name (¶10(a)(i));
> - A 2016 Chevrolet Sonic, subject to the debt thereon (¶10(a)(ii));
> - $1,122.62 for her share of the proceeds from the garage sale whereby Husband disposed of community household goods (¶10(a)(iii)); and
> - "50% of the community interest in the Federal Employment Retirement System ("FERS") benefits in Husband's name" (¶10(a)(iv)).[4]
> Other Assets Apportioned to Debtor. The Final Decree also apportioned to Debtor:
> - USAA checking account (¶10(B)(i));
> - First Security Bank checking account (¶10(B)(ii));

---

[3] The Final Decree listed ten credit card accounts, with a total balance of about $37,500. Only one of the cards was in Racquel's name.
[4] The Final Decree states that "the remaining assets and debts shall be divided as set forth in Exhibit 1 attached hereto . . ." There is no Exhibit 1 attached to the decree.

- Chase checking and savings accounts (¶10(B)(iii));
- Navy Federal CU checking account (¶10(B)(iv));
- 2016 Chevrolet Cruze (¶10(B)(v));
- One half of the garage sale proceeds (¶10(B)(vi));
- 50% of the community interests in the FERS benefits (¶10(B)(vii)); and
- His annual leave (¶10(B)(viii)).

<u>Debtor's Debts to Racquel</u>. The Final Decree required Debtor to pay the following amounts to Racquel:
- $4,014 as an equalization payment; and
- $2,500 as a sanction.

<u>Joint Tax Return</u>. Debtor and Raquel were required to file a joint tax return for 2019, sharing equally any refund or liability. They were to share equally any tax liability arising from using TSP account funds to pay the community credit card debts.

<u>Attorney Fees</u>. Debtor and Racquel were required to file affidavits about the attorney fees incurred in the divorce. The state court would then rule on whether to order one side pay the other side's attorney fees.

It appears Debtor did not comply with the Final Decree. On November 2, 2022, Racquel filed a Verified Motion for Contempt (the "Contempt Motion") in the divorce case, alleging that Debtor had not paid off the credit card in her name; did not give her one half of the garage sale proceeds; did not give her 50% of the FERS benefits; did not make the $4,104 equalization payment; did not pay the $2,500 sanction; and refused to file a joint 2019 income tax return. The Contempt Motion does not mention the division of the TSP account.

Debtor responded pro se to the Contempt Motion on November 14, 2022. Eight days later, he filed this chapter 13 case.

Also on November 22, 2022, the state court entered a Federal Employees Retirement System Order (the "FERS QDRO")[5] relating to the division of the FERS benefits. The FERS

---

[5] QDRO is an acronym for a "Qualified Domestic Relations Order," an order recognized by pension plan and retirement account administrators as sufficient in form and substance to change plan or account rights and ownership.

QDRO was submitted by Racquel's counsel and agreed to by Debtor. No similar QDRO was entered for the TSP account.

Debtor filed a chapter 13 plan on December 16, 2022. The plan proposes to pay allowed unsecured claims 100% without interest. The plan also proposes to pay the $2,000 monthly support payment to Racquel "outside the plan."

Debtor filed bankruptcy schedules on December 19, 2022. Among his scheduled assets are the TSP account and the FERS benefits, each with the notation "subject to division in disso." None of the other assets apportioned to Racquel in the Final Decree were scheduled.

Debtor scheduled a general unsecured claim of $25,000 owed to Racquel as a "TSP equalization payment." It is not listed as disputed. Debtor also scheduled a second debt to Racquel of $11,740 and listed it as disputed. It is not clear how this amount was calculated.

On January 12, 2023, the state court held a hearing on the Contempt Motion.

The deadline for Racquel to file a proof of claim was February 1, 2023. For reasons unknown, she did not file a proof of claim.

The state court issued a preliminary ruling on the Contempt Motion on April 4, 2023. The court made the following findings:

> 1. Respondent has failed to comply with the *Final Decree of Dissolution of Marriage*, filed on January 15, 2021, as follows:
>     a. Respondent has failed to pay the Wells Fargo American Express credit card in Petitioner's name (Account No. ending 5854);
>     b. Respondent has failed to pay Petitioner the $1,122.62 due and owing to her for her share of the proceeds from the garage sale whereby Respondent disposed of community household goods;
>     c. Respondent has failed to pay Petitioner the $4,410 equalization payment due and owing to her; and
>     d. Respondent has failed to pay Petitioner the $2,500 in sanction due and owing to her.
> 2. Respondent testified that he was unable to take a withdrawal from his Thrift Savings Plan ("TSP") account, as ordered, due to the outstanding loan on

the TSP.[6] Respondent further testified that the TSP loan would be paid off in August of 2023 and thereafter he would be able to pay Petitioner's Wells Fargo American Express as well as the other amount due and owing to Petitioner.

The state court also found that "The amounts due and owing to [Racquel] pursuant to [the Final Decree] . . . as well as [Racquel's] entitlement to her share of [Debtor's] TSP are in the nature of support and must be paid."

On April 6, 2023, Racquel filed a stay relief motion so she could complete the division of the FERS benefits. In response, Debtor pointed to the FERS QDRO and argued that the division had already been completed.

On April 18, 2023, the state court issued a supplemental ruling on the Contempt Motion, opining that it should not make a final decision until this Court lifted the automatic stay or the bankruptcy case had been concluded.[7]

The Court confirmed Debtor's plan on May 9, 2023. The plan is a "100% plan," meaning that all allowed unsecured claims are to be paid in full.

On May 19, 2023, Racquel filed the motion now before the Court, seeking stay relief so she can complete the division of the TSP account or, alternatively, for a ruling that the automatic stay does not apply. Debtor objected, arguing that the Final Decree did not give Racquel any property interest in the TSP account, but instead created an additional debt that Debtor owed to Racquel.

---

[6] Neither the loan nor the repayment is included in Debtor's filed Schedules (doc. 17).

[7] The timing of the April 4, 2023, order is somewhat confusing. The order, which related to the hearing held on January 12, 2023, was not issued until after the April 3, 2023, supplemental hearing. It appears to have been submitted by Racquel's counsel shortly after the January 12, 2023, hearing, as it gives Debtor a deadline of February 9, 2023, to produce certain TSP documents. Despite this deadline, the state court did not sign the order until April 3, 2023, the date of the second hearing.

B. <u>The Final Decree is Entitled to Full Faith and Credit</u>.

The Final Decree is a final judgment and is entitled to full faith and credit. As stated in *Holm v. Shilensky*, 388 F.2d 54 (2d Cir. 1968):

> The divorce decree is a final decree, Nevada Rev. Stats. § 125.130(1); it is elementary that, under the Full Faith and Credit Clause of the U.S. Constitution, U.S. Const. Art. IV, § 1, and also under 28 U.S.C. § 1738, a final decree of divorce rendered in one state 'should have the same credit, validity and effect, in every other court in the United States, which it had in the State where it was pronounced,' *Hampton v. M'Connel*, 16 U.S. (3 Wheat.) 234, 235, 4 L. Ed. 378 (1818) (Marshall, C.J.), as long as the jurisdictional facts, including domicile, are validly established whenever the decree is questioned. *Williams v. State of North Carolina*, 317 U.S. 287, 293-294, 63 S. Ct. 207, 87 L. Ed. 279 (1942). *See also Alton v. Alton*, 347 U.S. 610, 74 S. Ct. 736, 98 L. Ed. 987 (1954) (per curiam); *Davis v. Davis*, 305 U.S. 32, 59 S. Ct. 3, 83 L. Ed. 26 (1938); compare *Williams v. State of North Carolina*, 325 U.S. 226, 65 S. Ct. 1092, 89 L. Ed. 1577 (1945).

388 F.2d at 56; *see also Gov't Personnel Mut. Life Ins. Co. v. Kaye*, 584 F.2d 738, 739 (5th Cir. 1978) (citing *Holm*); *Desjardins v. Desjardins*, 308 F.2d 111, 116 (6th Cir. 1962) (Ohio divorce decree is a final judgment entitled to full faith and credit); *Rash v. Rash*, 960 F. Supp. 280, 282 (M.D. Fla. 1997) (same); *see generally Moucka v. Windham*, 483 F.2d 914, 916 (10th Cir. 1973) (full faith and credit given to divorce decree, but third party defendant was not a party to the divorce proceeding and was not bound thereby). "A federal court is bound to give such judgment the same force and effect as would a court of the state in which the federal court is sitting." *Desjardins*, 308 F.2d at 116, citing *Sutton v. Leib*, 342 U.S. 402, 409 (1952) and *Union & Planters Bank of Memphis v. Memphis*, 189 U.S. 71, 75 (1903).

C. <u>The Final Decree Apportioned One Half of the Net TSP Account to Racquel as Her Separate Property</u>.

The key dispute in this case is whether the Final Decree divided the TSP account between Debtor and Racquel, each obtaining a half interest as separate property, or whether instead the

decree created an obligation for Debtor to pay Racquel one half the net value of the TSP account. Unsurprisingly, Racquel argues for the former characterization, Debtor for the latter.

The Court holds that the Final Decree divided the TSP account and awarded Racquel a separate property interest in her portion. Thus, when Debtor filed this case, Racquel's portion of the TSP account did not become part of the bankruptcy estate. There is substantial case law support for this conclusion. For example, in *In re Brown*, 168 B.R. 331 (Bankr. N.D. Ill. 1994), the bankruptcy court held:

> In the present matter, the court is called upon to determine whether the division of the Debtor's pension under the state court decree gave rise to a separate property interest in the pension in favor of the Plaintiff or merely created a debt owing to the Plaintiff.
> . . .
>
> The question of whether or not the Plaintiff's interest in the pension plan is her separate property interest, and thus not part of her former husband's bankruptcy estate, is determined by reference to state law. *See e.g., Barnhill v. Johnson,* 503 U.S. 393, 112 S. Ct. 1386, 118 L. Ed. 2d 39 (1992); *Jones v. Atchison,* 925 F.2d 209 (7th Cir. 1991), *cert. denied,* 502 U.S. 860, 112 S. Ct. 178, 116 L. Ed. 2d 140 (1991). Under Illinois law, a pension fund created during the marriage is marital property subject to division. [citing cases] . . . . upon entry of a judgment of divorce, ownership vests in the spouse to whom such property has been distributed. *See e.g. Roehn,* 216 Ill. App. 3d at 894, 576 N.E.2d at 562, 159 Ill. Dec. at 893 (insofar as ex-wife's beneficial interest in pension fund was acquired during the marriage, upon dissolution of marriage ex-wife became co-owner of the pension benefits as marital property).
>
> The majority view among courts considering the question in the bankruptcy context is in accord with Illinois law, i.e., that a former spouse's interest in a debtor's pension becomes the sole and separate property of the nondebtor spouse upon entry of a final judgment of divorce. The divorce decree does not create a debtor/creditor relationship between the debtor spouse and the nondebtor spouse. Instead, each becomes an owner of a portion of the pension. *In re Potter,* 159 B.R. 672, 674 (Bankr. N.Y. 1993); *see generally In re Byler,* 160 B.R. 178, 180 (Bankr. N.D. Okl. 1993); *Matter of Newcomb,* 151 B.R. 287 (Bankr. M.D. Fla. 1993); *In re Resare,* 142 B.R. 44, 46 (Bankr. D.R.I. 1992), *aff'd* 154 B.R. 399 (D.R.I. 1993); *In re Long,* 148 B.R. 904 (Bankr. W.D. Mo. 1992) (interest of non-employee spouse in non-military pension is the sole property of such spouse); *In re Ledvinka,* 144 B.R. 188, 192 (Bankr. M.D. Ga. 1992) (*citing Bush v. Taylor,* 912 F.2d 989, 993 (8th Cir.1990)); *In re Zick,* 123 B.R. 825 (Bankr. E.D. Wis. 1990) (where prepetition

> divorce decree awarded wife portion of pension, that portion did not constitute husband's property at time of bankruptcy filing and thus could not be excepted from discharge); *In re Farrow,* 116 B.R. 310 (Bankr. M.D. Ga. 1990); *In re Benich,* 811 F.2d 943, 945 (5th Cir. 1987); *In re Chandler,* 805 F.2d 555 (5th Cir. 1986) (monthly army retirement benefits awarded to wife pursuant to divorce decree were sole and separate property of wife and did not become property of the debtor's estate); *accord In re Beattie,* 150 B.R. 699, 701 (Bankr. S.D. Ill. 1993).

168 B.R. at 334. For additional case law support, *see Martin v. Awve*, 558 B.R. 889, 893 (W.D. Wis. 2016) (citing and following *Brown*); *Dewey v. Dewey*, 525 N.W.2d 85, 87 (Wis. App. 1994) ("a division of a pension plan pursuant to a divorce decree does not create an obligation in the employee-spouse but creates two separate property interests that become vested at the moment the decree is entered."); *In re Gendreau*, 191 B.R. 798, 803 (9th Cir. BAP 1995) (the right to the pension benefits arose when the divorce decree was entered, and was not, as the Debtor argues, dependent on an order satisfying the technical requirements detailed by the plan administrator."); *In re Combs*, 435 B.R. 467, 474 (Bankr. E.D. Mich. 2010) (same); and *In re St. Clair*, 2011 WL 6888369, *3 (Bankr. D.N.J.) (same).

There are sound reasons for this strong majority view. If the retirement account is divided, no cash has to change hands and no debts are created. The tax advantages of owning a retirement account or pension benefit are preserved. The annoyance of having one ex-spouse become the creditor of the other is avoided, as is the specter of a potential bankruptcy discharge. Also avoided is the tax burden on the spouse who keeps the account but must pay half its value with after-tax dollars. While it may be advisable in some circumstances to allow one spouse to keep a retirement account/pension benefit and pay the other spouse for the value of his or her share, a divorce decree would have to make that treatment clear. Here, the language of the Final Decree leaves no room for doubt that the TSP account was divided in two equal parts, each spouse taking half as separate property.

The fact that no QDRO has yet been entered for the TSP account does not change the result: the division of property occurs when the divorce decree is entered, not when subsidiary matters like entering a QDRO have been completed. *See, e.g., Gendreau*, 191 B.R. at 801 (ex-wife of debtor obtained a property interest in debtor's pension plan when the divorce decree awarded it to her; the lack of a QDRO did not turn her property right into a claim); *Brown* 168 B.R. at 335 ("the QDRO merely served to enforce her preexisting property rights in the pension"); *Martin v. Awve*, 558 B.R. at 893 (entry of divorce decree, not QDRO, gave ex-wife a property interest in debtor's retirement account); *Combs*, 435 B.R. at 472 (citing and following *Brown*); *St. Clair*, 2011 WL 6888369, at *3-4 (citing and following *Brown*, the court held that "upon the entry of the [final divorce decree], the Debtor had an obligation to hold [ex-husband's] entitlement in her retirement plans in constructive trust so as to avoid unjust enrichment, notwithstanding the failure to secure a QDRO"); *In re Long*, 148 B.R. 904, 908 (Bankr. W.D. Mo. 1992) (to the same effect).

Likewise, the fact that community debts were ordered to be paid from the TSP account does not alter the fact that the state court divided ownership of the account between the parties. Payment of the community debts with TSP funds merely reduced the divisible account balance.

D.   <u>Tax Consequences</u>.

With respect to income tax liability for 2019 and the TSP withdrawals, the Court will modify the automatic stay to allow the state court to enforce the Final Decree. There likely would be adverse tax consequences to withdrawing funds from the TSP account to pay community debts. Possibly, the parties could agree to an alternative way of paying those debts that would be more tax efficient. If such an agreement were reached, it could be implemented by an agreed plan modification and an agreed supplemental decree entered in state court. If not, the state court will be free to enforce the Final Decree.

E.  Nondischargeable Domestic Support Obligation or Dischargeable Property Settlement?

Based on the state court's April 4, 2023, order ("The amounts due and owing to Petitioner [under the Final Decree] . . . are in the nature of support and must be paid"), there may be a dispute between the parties about the nature of some or all of Debtor's obligations to Racquel. *See* §1328(a)(2). If so, this Court is the appropriate court to rule on the dispute. *See, e.g., In re Sampson*, 997 F.2d 717, 721 (10th Cir. 1993 ("Whether a debt is nondischargeable under § 523(a)(5) is a question of federal law"); *In re Redfearn*, 608 B.R. 556, 560-61 (Bankr. D.N.M. 2019) (citing and following *Sampson*); *In re Miller*, 284 B.R. 734, 738 (10th Cir. BAP 2002) (quoting *Sampson*); *In re Bernritter*, 2014 WL 2718592, at *4 (Bankr. D. Kan.) (same, citing *Sampson*); *In re Esparsen*, 545 B.R. 330, 333 (Bankr. D.N.M. 2016) (same). There is no statutory deadline to seek such a ruling. *See* Fed. R. Bankr. P. 4007(b).

If some of Debtor's obligations to Racquel are nondischargeable domestic support obligations, it might be beneficial to the parties to figure out a way (if possible) to pay the obligations under the confirmed plan.

F.  Cause Exists to Modify the Automatic Stay.

Racquel requested as alternative relief a finding that the automatic stay does not apply to enforcing her rights to the TSP account. She probably is right; because her interest in the TSP account did not become part of Debtor's bankruptcy estate, the automatic stay does not prevent her proceeding to obtain all rights of ownership. However, some of the issues raised in the motion and Debtor's response, e.g., payment of the community credit card debts from the TSP account, directly affect the confirmed plan and the estate. The Court therefor holds that the better remedy is stay relief, if there is "cause" to grant the relief.

"Cause" under § 362(d)(1) "is an intentionally broad and flexible concept which must be determined on a case-by-case basis." *In re Project Orange Associates, LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (quoting *In re Brown*, 311 B.R. 409, 412-13 (E.D. Pa. 2004)). "Indeed, there are a multitude of reported decisions discussing relief from the stay for "cause," all of which are fact intensive and generally offer no precise standards to determine when "cause" exists to successfully obtain relief from the stay." *In re Merchant*, 256 B.R. 572, 576 (Bankr. W.D. Pa. 2000) (citing *In re Holly's Inc.*, 140 B.R. 643, 687 (Bankr. W.D. Mich. 1992). *See also In re Castlerock Properties*, 781 F.2d 159, 162 (10th Cir. BAP 1986) ("Because there is no clear definition of what constitutes 'cause', discretionary relief from the stay must be determined on a case by case basis.") "A creditor seeking relief from the automatic stay for 'cause' bears the initial burden of going forward to demonstrate sufficient grounds to lift the stay." *In re Thorp*, 624 B.R. 726, 740 (Bankr. D.N.M. 2020) (citing *In re DB Capital Holdings, LLC*, 454 B.R. 804, 816 (Bankr. D. Colo. 2011)).

Here, Racquel has carried her burden of showing "cause" for the stay modification she requests. She is entitled to enforce the property rights given her by the Final Decree.

G.    Avenues for a Settlement of Disputes.

While considering Racquel's motion, Debtor's response, and how best to rule on the dispute, the following salient facts kept recurring to the Court:

- Chapter 13 gives Debtor a tool not available in state court: the ability to pay debts to third party creditors over time. If Debtor and Racquel could set aside their differences for the time being, they might be able to use this tool to their mutual advantage. For example, Debtor's proposal to pay the credit card debt in full, over time, as part of his chapter 13 plan, would allow the TSP account to remain "unraided." That would avoid withdrawal

penalties and other income tax disadvantages. The parties could share the resulting benefit in some equitable manner;

- Debtor's chapter 13 plan is not a bad deal for Racquel. It pays most of the credit card debt (but not the card in her name!), pays $25,000 for her interest in the TSP account, and pays her an additional $11,774. While perhaps Debtor should have increased his proposed payments to Racquel for this debt or that, the plan is not a "throw the ex-wife to the wolves" plan. Debtor and his bankruptcy counsel are to be commended for this good faith attempt to deal with Debtor's obligations to his ex-wife;

- Racquel did not file a proof of claim. That is not helpful for her. In most circumstances, it would be disastrous; but

- It is an open question whether some or all of Debtor's obligation to Racquel are in the nature of support or are property settlement debts. If they are domestic support obligations, and therefore nondischargeable, Racquel's failure to file a claim could harm Debtor more than it harms her.

These facts, over which the Court has pondered at some length, cry out for a negotiated settlement between the parties, with terms neither this Court nor the state court could order. A deal now, using the chapter 13 tools to their mutual advantage, could leave both parties better off than had they adhered to the Final Decree in 2021. Because of this, the Court will delay the effectiveness of its stay relief order for 30 days. In the interim, the Court will explore with bankruptcy counsel whether a settlement can be negotiated. If it is thought that a mediator would be helpful, then the Court will see if Chief Judge Jacobvitz or one of his law clerks would be willing to mediate, free of charge.

Conclusion

The Court will modify the automatic stay to (i) allow Racquel to complete the division of the TSP account in accordance with the Final Decree; (ii) allow Racquel to complete the division of the FERS benefits, if any further action is necessary; and (iii) to enforce the tax provisions in paragraph 12 of the Final Decree. The effective date of the order will be delayed for 30 days to give the parties time to explore settlement. A separate order will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: October 27, 2023
Copies to: Counsel of record